**OVERLOOK MUTUAL HOMES, INC., Plaintiff,**

v.

**Vickie L. SPENCER, Defendant,**

and

**Joey Spencer, Counterclaim–Plaintiff.**

**Case No. 3:07cv398.**

United States District Court, S.D. Ohio, Western Division.

July 16, 2009.

Edward Michael Smith, Nolan, Sprowl, Foley and Smith, Gordon Dale Arnold, Freund Freeze & Arnold, John Randolph Folkerth, Jr., Weprin Folkerth & Routh LLC, Dayton, OH, for Plaintiff.

Michael Allen, Relman & Dane PLLC, Washington, DC, Stephen M. Dane, Relman & Dane PLLC, Perrysburg, OH, for Defendant.

DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. # 32)

WALTER HERBERT RICE, District Judge.

This litigation arises out of the efforts of Vickie and Joey Spencer (collectively the "Spencers") to keep a dog in their dwelling at the residences managed by Plaintiff Overlook Mutual Homes, Inc. ("Overlook").[1] Overlook is a mutual housing corporation, which is operated by its members, all of whom are residents living at the property owned by Overlook. The members operate Overlook through an elected Board of Trustees ("Board"), which is authorized to adopt rules and regulations. One of those rules, the no pet rule, prohibits members/residents from having pets, except for service animals which are necessary to accommodate a resident's disability.

In April, 2007, after other residents had complained about the noise made by a barking dog in the Spencer's dwelling, Overlook provided written warning to them that they were with violating the no pet rule.[2] In response, Vickie Spencer

---

1. Overlook sued Vickie Spencer individually and in her capacity as parent and natural guardian of her daughter Lynsey Spencer ("Lynsey"). Joey Spencer became a party to this litigation as a Counterclaim–Plaintiff.

2. The dog is a neutered, male Cockapoo

submitted an affidavit, stating that the dog had been permanently removed. Subsequently, however, she visited the Miami Valley Fair Housing Center ("MVFHC"), which resulted in its President, Jim McCarthy ("McCarthy"), writing a letter to Overlook, under date of August 1, 2007. Therein, McCarthy requested a reasonable accommodation on behalf of the Spencers, to permit Lynsey to keep Scooby. McCarthy explained that Lynsey was currently receiving psychological counseling and that her psychologist had recommended that Lynsey have a companion/service dog to facilitate her treatment. McCarthy also enclosed a statement from Miriam Hoefflin ("Hoefflin"), Lynsey's treating psychologist, indicating that, as a result of her assessment and counseling of Lynsey, she had recommended that the child "have a service dog to facilitate treatment."

John Folkerth ("Folkerth"), an attorney representing Overlook in this litigation, responded to McCarthy's letter. In particular, Folkerth set forth therein his reasons for being skeptical of Vickie Spencer's assertion that her daughter needed to keep the dog as a service animal. He also indicated that, if Lynsey was disabled and in need of a service animal, Overlook would be willing to engage in a dialogue to determine whether a reasonable accommodation could be provided. In addition, Folkerth stated that Vickie Spencer would be required to fill out a form, seeking a waiver of the no pet rule and requested all manner of information concerning Lynsey's asserted disability and need for the dog as a service animal. He requested that the information be provided in two weeks and that, in the meantime, Overlook would refrain from initiating eviction proceedings against the Spencers. Thereafter, Vickie Spencer filled out an Overlook request for accommodation form, asserting

that the dog was necessary to ameliorate her daughter's disability, which she described as anxiety disorder and neurological and emotional conditions. McCarthy also provided some additional information concerning Lynsey's disability and her need for the dog as a reasonable accommodation.

On September 10, 2007, Folkerth wrote back to McCarthy, indicating that the information McCarthy had provided was not sufficient to permit Overlook's Trustees to determine whether Lynsey was disabled as defined by law and whether the accommodation requested was appropriate or necessary. Folkerth also included releases for Lynsey's medical and psychological records maintained by Hoefflin. In addition, he stated that, depending upon the content of the released records, additional information could be required and cautioned that if signed releases were not returned, the Trustees would file suit to obtain those records. On September 25, 2007, Michael Allen ("Allen"), the attorney representing the Spencers in this litigation, wrote to Folkerth in response, explaining that he had been retained by Vickie Spencer and the MVFHC in the matter of the request for a reasonable accommodation on behalf of Lynsey and that, while concerned about the failure of Overlook to grant same, he was most disturbed by the invasiveness of the inquiry into her medical records, which Folkerth had proposed. To bridge their differences, Allen suggested that he and Folkerth conduct a conference call with Hoefflin, during which Folkerth could ask the treating psychologist questions about why the dog was necessary to afford Lynsey the equal opportunity of enjoying the Spencers' unit at Overlook. Allen also indicated that Hoefflin would be on vacation and could not participate in a conference

---

named Scooby. A Cockapoo is a "designer dog" created by breeding an American or English Cocker Spaniel with a Poodle, usually of the miniature or toy variety.

call until October 10, 2007, and that he would be available for such a conference call during the afternoons of October 10th, 11th and 12th. There is no evidence that the conference call proposed by Allen ever took place.[3] Overlook initiated this litigation on October 17, 2007.

In its Complaint against Vickie Spencer, Overlook requests that this Court enter relief, declaring the following, to wit: 1) that it must be provided with the medical and counseling records maintained by Hoefflin, in order to permit it to determine whether Lynsey is disabled within the meaning of the law; 2) that its request for records maintained by Hoefflin is not in violation of federal or state law prohibiting housing discrimination; 3) that, upon Vickie Spencer's failure to provide those records, it was not obligated to waive its no pet rule and could enforce same; and 4) that the dog, Scooby, is not a service animal as defined by law and does not qualify as a reasonable accommodation for purposes of waiving its no pet rule. Doc. # 1 at 7.

Vickie Spencer, joined by her husband Joey, responded to Overlook's Complaint, by, *inter alia*, asserting a Counterclaim. *See* Doc. # 3. In that pleading, the Spencers have set forth the following claims for relief, to wit: 1) a claim that Overlook has violated the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.*, by enforcing the no pet rule and failing to make a reasonable accommodation of that rule;[4] 2) a claim

under Ohio's fair housing statute, § 4112.02(H) of the Ohio Revised Code, setting forth similar allegations against Overlook, and, in addition, alleging the making of impermissible inquiries on the basis of disability and coercing, intimidating and interfering with the Spencers because of their advocacy of disability rights; and 3) a claim of negligence under the common law of Ohio. Doc. # 3 at ¶¶ 46–56. The Spencers request injunctive relief; compensatory, statutory and punitive damages; and costs, including reasonable attorney's fees. *Id.* at 18.

This case is now before the Court on Overlook's Motion for Summary Judgment (Doc. # 32).[5] As a means of analysis, the Court will initially set forth the procedural standards it must apply whenever it rules on a motion for summary judgment, following which it will turn to the parties' arguments in support of and in opposition to the instant such motion.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, an-

---

**3.** Although Allen states in the Spencers' Memorandum in Opposition to Overlook's Motion for Summary Judgment that it did not (*see* Doc. # 33 at 5), statements of counsel in a memorandum are not evidence.

**4.** The FHA makes it unlawful to discriminate on the basis of handicap and defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal

opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

**5.** With that motion, Overlook has also requested that this Court preclude Lynsey's treating psychologist, Miriam Hoefflin, from testifying. This Court will rule upon that branch of Overlook's motion after it has conducted the hearing it discussed with counsel during the pretrial conference conducted by telephone on Friday, July 10, 2009.

swers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Wright, Miller & Kane, *Federal Practice and Procedure,* § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th

Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

With its motion, Overlook has set forth three arguments in support of its request for summary judgment, to wit: 1) that it is permitted to set pet policies for its tenants and to obtain the information necessary to evaluate the appropriateness of a tenant's request for a waiver of the no pet rule (Doc. # 32 at 10–12); 2) that an animal must have individual training to qualify as a "service animal" under the federal definition of that term (*id.* at 12–13); and 3) that it is entitled to summary judgment on the Spencers' negligence claim (*id.* at 13–15). As a means of analysis, the Court will address those three arguments in the above order.

**6.** The Spencers also claim that Overlook has violated § 4112.02(H) of the Ohio Revised Code by those actions. This Court does not discuss that claim separately, since the Sixth Circuit has noted, while not discussing the state claims separately, that such claims are equivalent to claims under the FHA. *Groner v. Golden Gate Gardens Apartments,* 250 F.3d 1039, 1043 (6th Cir.2001). *See also, Carter v. Russo Realtors,* 2001 WL 537019 (Ohio App. 2001) (noting that Ohio's fair housing legislation is to be interpreted in accordance with the FHA).

### A. Overlook Is Permitted to Set Pet Policies for its Tenants and to Obtain the Information Necessary to Evaluate the Appropriateness of a Tenant's Request for a Waiver of the No Pet Rule

■ As indicated, the Spencers allege that Overlook has violated 42 U.S.C. § 3604(f)(3), by failing allow them to keep Scooby.[6] "To prevail on a claim under 42 U.S.C. § 3604(f)(3), a plaintiff must prove all of the following elements: (1) that the plaintiff or his associate is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation." *DuBois v. Association of Apartment Owners of 2987 Kalakaua,* 453 F.3d 1175, 1179 (9th Cir.2006), *cert. denied,* 549 U.S. 1216, 127 S.Ct. 1267, 167 L.Ed.2d 92 (2007). *See also, Dinapoli v. DPA Wallace Ave II, LLC,* 2009 WL 755354, *5 (S.D.N.Y.2009); *Fialka–Feldman v. Oakland University Bd. of Trustees,* 2009 WL 275652, *6 (E.D.Mich. 2009); *United States v. District of Columbia,* 538 F.Supp.2d 211, 218 (D.D.C. 2008); *Stassis v. Ocean Summit Ass'n, Inc.,* 2008 WL 1776988, *2 (S.D.Fla.2008);

Parenthetically, the Spencers claim under § 4112.02(H) includes allegations that Overlook violated that statute by making impermissible inquiries on the basis of disability and coercing, intimidating and interfering with the Spencers because of their advocacy of disability rights. Since those aspects of the Spencers' Ohio statutory claim have been omitted from the Final Pretrial Conference Order (*see* Doc. # 43 at 3), they have been waived.

*Means v. City of Dayton,* 111 F.Supp.2d 969, 978 (S.D.Ohio 2000); *Schanz v. Village Apartments,* 998 F.Supp. 784, 791 (E.D.Mich.1998). The Sixth Circuit, however, has held that an accommodation must be necessary. *See Howard v. City of Beavercreek,* 276 F.3d 802, 806 (6th Cir.2002) (noting that " 'the concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability' ") (quoting *Bronk v. Ineichen,* 54 F.3d 425, 429 (7th Cir.1995)). Thus, the third above-quoted element has been effectively modified by the Sixth Circuit to replace the "may be" with "is".

■ Overlook contends that it is entitled to summary judgment, because it is permitted to set pet policies for its tenants and to obtain the information necessary to evaluate the appropriateness of a tenant's request for a waiver of the no pet rule. This Court will decline to enter summary judgment in favor of Overlook on this proposition. Initially, this Court cannot agree with Overlook that it is free to set pet policies for its tenants. On the contrary, such policies must comply with the FHA. Given that Overlook has failed to demonstrate that the evidence does not raise a genuine issue of material fact as to whether its no pet policy, as applied to the Spencers, violates the FHA, that question will be resolved by the jury after the presentation of the evidence.

■ For two reasons, the Court denies Overlook's request for summary judgment, on the basis that it was permitted to obtain information necessary to evaluate the appropriateness of a tenant's request for a waiver of the no pet rule. First, the Spencers have not alleged that Overlook violated the FHA by requesting information concerning Lynsey's disability and need for Scooby. Although they initially alleged that Overlook's request for such information violated § 4112.02(H), such a claim is not included in their claims that have been identified in the Final Pretrial Statement. *See* Doc. # 43 at 3. Therefore, that claim has been waived. Given that the Spencers are not alleging that Overlook violated either the federal or state statute by requesting such information, the Court questions whether Overlook's request for declaratory relief on that question presents an actual controversy. Until it is satisfied that Overlook's claim in that regard presents such a controversy, this Court will not proceed to trial on such a claim, let alone enter judgment in favor of Overlook on it.

■ *Second,* the Department of Housing and Urban Development ("HUD") and the Department of Justice ("DOJ") indicated in their Joint Statement on Reasonable Accommodations under the FHA that the provider of housing is entitled to obtain only that information necessary to determine whether the requested accommodation is necessary because of a disability. Construing the evidence most strongly in favor of the Spencers, the Court concludes that there is a genuine issue of material fact on the issue of whether the information sought by Overlook was necessary. Overlook initiated this litigation without taking advantage of the Spencers' offer to allow its counsel to participate in a conference call with their counsel and Hoefflin, Lynsey's treating psychologist. During that conference call, Overlook's counsel would have been permitted to question Hoefflin on Lynsey's disability and her need for Scooby. Consequently, there is a genuine issue of material fact as to whether Overlook was offered the opportunity to obtain the necessary information, an opportunity which it unilaterally chose to disregard.

Accordingly, the Court rejects Overlook's contention that it is entitled to sum-

mary judgment, because it is permitted to set pet policies for its tenants and to obtain the information necessary to evaluate the appropriateness of a tenant's request for a waiver of the no pet rule.

### B. An Animal Must Have Individual Training to Qualify as a "Service Animal" under the Federal Definition of that Term

While this proposition is phrased somewhat abstractly, Overlook contends that it is entitled to summary judgment on the Spencer's claim under the FHA, because Scooby is not a "service animal." Although that term is not to be found in the FHA or in regulations interpreting that statute,[7] Overlook contends that this Court must apply that term and its definition found in regulations adopted to enforce a different statute, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* In particular, "service animal" is defined in 28 CFR § 36.104, as:

> any guide dog, signal dog, or other animal *individually trained* to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items.

(Emphasis added). The Spencers have not challenged Overlook's assertion that Scoo-

by will qualify as a "service animal," under the ADA regulation, only if he was individually trained. Moreover, as Overlook argues, the uncontroverted evidence, Vickie Spencer's responses to its interrogatories, demonstrates that Scooby was not individually trained. Nevertheless, the Spencers argue that Overlook is not entitled to summary judgment on this point, because it is not necessary for Scooby to be a service animal, in order to qualify as a reasonable accommodation under the FHA. For reasons which follow, this Court agrees with the Spencers and, thus, rejects Overlook's argument that it is entitled to summary judgment on all claims under the FHA because Scooby was not individually trained, as is required of service animals under the regulations adopted to enforce a different statute, the ADA.

In support of this premise, Overlook places primary reliance upon *In re Kenna Homes Co-op. Corp.*, 210 W.Va. 380, 557 S.E.2d 787 (2001). Therein, the West Virginia Supreme Court addressed the issue of whether an animal had to qualify as a service animal under the regulations governing the ADA, in order to constitute a reasonable accommodation under the FHA. The West Virginia Supreme Court concluded that only a service animal could qualify as a reasonable accommodation under the FHA, writing:

> In sum, we hold that the Federal Fair Housing Act, 42 U.S.C. §§ 3601 to 3631,

---

**7.** A regulation adopted by HUD, a federal agency charged with enforcing the FHA, provides in relevant part:

(a) It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas.

(b) The application of this section may be illustrated by the following examples:

Example (1): A blind applicant for rental housing wants live in a dwelling unit with a seeing eye dog. The building has a no pets policy. It is a violation of § 100.204 for the owner or manager of the apartment complex to refuse to permit the applicant to live in the apartment with a seeing eye dog because, without the seeing eye dog, the blind person will not have an equal opportunity to use and enjoy a dwelling. 24 CFR § 100.204.

... require[s] that a service animal be individually trained and work for the benefit of a disabled person in order to be considered a reasonable accommodation of that person's disability. A person claiming the need for an alleged service animal as a reasonable accommodation of his or her disability has the burden of proving these requirements. Further, under the Federal Fair Housing Act, 42 U.S.C. §§ 3601 to 3631 ..., a landlord or person similarly situated may require a disabled tenant who asserts the need to keep an alleged service animal to show that the animal is properly trained; to produce in writing the formal assertion of the trainer that the animal has been so trained; and to present a statement from a licensed physician specializing in the field of [the] subject disability which certifies that the alleged service animal is necessary to ameliorate the effects of the tenant's disability.

*Id.* at 392–93, 557 S.E.2d at 799–800. In *Prindable v. Association of Apartment Owners of 2987 Kalakaua,* 304 F.Supp.2d 1245 (D.Hawai'i 2003), *affirmed on other grounds sub nom., DuBois v. Association of Apartment Owners of 2987 Kalakaua,* 453 F.3d 1175 (9th Cir.2006), *cert. denied,* 549 U.S. 1216, 127 S.Ct. 1267, 167 L.Ed.2d 92 (2007), the District Court followed *Kenna Homes* and held that an animal did not constitute a reasonable accommodation under the FHA, unless it had been individually trained. 304 F.Supp.2d at 1256.[8]

■ In opposition, the Spencers contend that reasonable accommodations under the FHA are not limited to animals which qualify as service animals; rather, they contend that such animals include emotional support animals, the function which Scooby was fulfilling with Lynsey. The Spencers point out that the only place in the regulations adopted to enforce the ADA, in which service animals are discussed, other than the above quoted definition of that term, is 28 CFR § 36.302(c), which generally provides that a public accommodation "shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." The FHA, in contrast with the ADA, does not regulate disability discrimination by public accommodations and in places of public accommodation.[9] Rather,

---

8. That case involved an owner of a condominium unit and his associate, who were in a dispute with the condominium owners association over the question of whether keeping a dog was a reasonable accommodation to the mental disability of one of the occupants. The District Court entered summary judgment in favor of the association, because the dog had not been individually trained. Upon appeal, the Ninth Circuit affirmed, noting that one of the elements of a claim under 42 U.S.C. § 3604(f)(3)(B) was that the defendant refuse to grant the plaintiff's request for a reasonable accommodation. Since the two had moved out of the unit and the association had not previously required that the dog leave, the Ninth Circuit concluded that the plaintiffs could not establish that essential element of their claim. In addition, the Ninth Circuit explicitly noted that it was not addressing the question of "whether the plaintiffs must prove that [the dog] is an individually trained service animal." 453 F.3d at 1179 n. 2.

9. A public accommodation is defined by the regulations governing the ADA as "a private entity that owns, leases (or leases to), or operates a place of public accommodation." 28 CFR § 36.104. Places of public accommodation are defined by those regulations as "a facility, operated by a private entity, whose operations affect commerce and fall within at least one of [eleven] categories." The categories include places of lodging, such as motels and inns; establishments serving food and drink; places of entertainment or exhibition, such as movie theaters and stadia; establishments offering items for sale or rent, such as grocery stores and shopping centers; establishments providing services, such as banks, offices and hospitals; places of education; places of public display or collection, such as libraries and museums; places of recreation,

the FHA, *inter alia*, makes it illegal to discriminate against handicapped individuals in providing housing. 42 U.S.C. § 3604(f)(1). Simply stated, there is a difference between not requiring the owner of a movie theater to allow a customer to bring her emotional support dog, which is not a service animal, into the theater to watch a two-hour movie, an ADA-type issue, on one hand, and permitting the provider of housing to refuse to allow a renter to keep such an animal in her apartment in order to provide emotional support to her and to assist her to cope with her depression, an FHA-type issue, on the other.

Based upon the foregoing alone, this Court would conclude that accommodations under the FHA regarding animals are not limited to service animals. However, additional indicia demonstrate that the two federal agencies charged with enforcing that statute, HUD and the DOJ, take the opposite position from that advocated herein by Overlook. For instance, HUD recently revised its regulations concerning pet ownership by the elderly and persons with disabilities residing in HUD-assisted, public housing. *See Pet Ownership for the Elderly and Persons with Disabilities,* 73 F.R. 63834–38 (October 27, 2008). The revised regulation excludes from HUD's regulations prohibiting pet ownership in public housing "animals that are used to assist, support, or provide service to persons with disabilities." 24 CFR § 5.303. HUD has explained that the revised rule applies not just to service animals, as defined by the regulations implementing the ADA, but also to support and therapy animals. 73 F.R. 63834. Such animals are defined to include those "providing emotional support to persons who have a disability related need for such support." *Id.* As can be seen, HUD has declined to limit

its regulation on keeping animals to those that have been individually trained, unlike the regulations implementing the ADA. HUD explained its reasons for doing so:

Finally, the Department believes that removing the animal training requirement ensures equal treatment of persons with disabilities who need animals in housing as a reasonable accommodation, for a wide variety of purposes. While many animals are trained to perform certain tasks for persons with disabilities, others do not need training to provide the needed assistance. For example, there are animals that have an innate ability to detect that a person with a seizure disorder is about to have a seizure and can let the individual know ahead of time so that the person can prepare. This ability is not the result of training, and a person with a seizure disorder might need such an animal as a reasonable accommodation to his/her disability. Moreover, emotional support animals do not need training to ameliorate the effects of a person's mental and emotional disabilities. Emotional support animals by their very nature, and without training, may relieve depression and anxiety, and/or help reduce stress-induced pain in persons with certain medical conditions affected by stress.

Comment: Proposed elimination of training component is inconsistent with the regulations implementing the Americans with Disabilities Act. Several commenters wrote that the applicable definition of the term "service animal" is contained in the Department of Justice regulations implementing the Americans with Disabilities Act (ADA) (42 U.S.C. 12101 et seq.). The commenters wrote that HUD regulations have never specif-

---

such as zoos and amusement parks; terminals, depots, or other stations used for public transportation; and social service center es-

tablishments, such as day care centers, homeless shelters and food banks. *Id.*

ically defined the term "service animal." Under the ADA regulations at 28 CFR 36.104, a service animal is defined as an animal "individually trained" to do work or perform tasks for the benefit of an individual with a disability. The commenters wrote that this definition covers both ADA claims and claims under Section 504, which HUD is responsible for enforcing. Also according to the commenters, by eliminating the training requirement, the proposed rule contradicts the ADA definition.

HUD Response: The Department does not agree that the definition of the term "service animal" contained in the Department of Justice regulations implementing the ADA should be applied to the Fair Housing Act and Section 504. The ADA governs the use of animals by persons with disabilities primarily in the public arena. There are many areas where the ADA and the Fair Housing Act and Section 504 contain different requirements. For example, accessibility is defined differently under the ADA than under the Fair Housing Act and Section 504.

The Fair Housing Act and HUD's Section 504 regulations govern the use of animals needed as a reasonable accommodation in housing. HUD's regulations and policies pertaining to reasonable accommodation were constructed specifically to address housing and, furthermore, were enacted prior to the development and implementation of the ADA regulations. Thus, the requirements for assistance/service animals must be evaluated in the appropriate context of housing, and are independent of the ADA regulations that were formulated to meet the needs of persons with disabilities in a different context and

were adopted subsequent to HUD's regulations.

There is a valid distinction between the functions animals provide to persons with disabilities in the public arena, i.e., performing tasks enabling individuals to use public services and public accommodations, as compared to how an assistance animal might be used in the home. For example, emotional support animals provide very private functions for persons with mental and emotional disabilities. Specifically, emotional support animals by their very nature, and without training, may relieve depression and anxiety, and help reduce stress-induced pain in persons with certain medical conditions affected by stress. Conversely, persons with disabilities who use emotional support animals may not need to take them into public spaces covered by the ADA.

*Id.* at 63836.[10] Although the revised rule applies only to HUD-assisted public housing, as opposed applying to housing generally, as does the FHA, the rationale in support thereof is equally applicable to all types of housing regulated by the FHA.

In addition, subsequent to the decision of the West Virginia Supreme Court in *Kenna Homes,* the DOJ, in conjunction with HUD, brought an action against that entity, alleging that it had violated the FHA by implementing a rule which limited the types of dogs residents could keep to dogs that were trained and certified for a particular disability, a rule which had the effect of denying a mentally impaired resident the ability to keep a dog which provided emotional support. *United States v. Kenna Homes Cooperative Corp.,* Case No. 2:04–783 (S.D.W.Va.) at Doc. # 1. Kenna Homes and the Government subse-

---

**10.** Section 504 mentioned in the foregoing refers to § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

quently entered into a consent decree, under which the former agreed to adopt an exception to any rule preventing residents from keeping pets, by permitting disabled residents to have service animals or emotional support animals. *Id.* at Doc. # 7. An emotional support animal was defined as an animal, "the presence of which ameliorates the effects of a mental or emotional disability." *Id.*

In sum, this Court concludes that the types of animals that can qualify as reasonable accommodations under the FHA include emotional support animals, which need not be individually trained. Accordingly, the Court rejects Overlook's assertion that it is entitled to summary judgment, because Scooby was not so trained.

*C. Negligence*

 Overlook moves for summary judgment on the Spencers negligence claim, arguing that it is entitled to same because it has not taken action against the Spencers, pending disposition of Vickie Spencer's request for a waiver of the no pet rule. As a consequence, Overlook's argument continues, the Spencers have not suffered any harm. Based upon Vickie Spencer's declaration and other evidence before the Court, this Court concludes that the evidence raises a genuine issue of material fact as to whether the Spencers have suffered harm. Overlook, acting through its counsel, has raised the specter of evicting the Spencers for violating the no pet policy. In her declaration, Vickie Spencer states that she and her husband have lost sleep and suffered anxiety as a result of feeling that they will lose their home over the presence of Scooby.

Alternatively, Overlook argues that it is entitled to summary judgment on this claim, because it did not owe the Spencers a duty, a fundamental element of any claim of negligence. In particular, relying on *Kenna Homes,* Overlook contends that in

determining whether a duty exists, its Board of Trustees was required to consider the interests of other tenants, who chose to live in a pet free environment, as well as the damage that can be caused by "[e]ven the most carefully controlled and well behaved pets." Doc. # 32 at 14. Simply stated, in the absence of Ohio authority to the contrary, this Court cannot conclude that the duty required in an Ohio negligence claim cannot be based on a violation of the FHA and Ohio's statutory counterpart, § 4112.02(H). This Court notes that Ohio courts have frequently recognized that a negligence claim can be based upon a violation of other anti-discrimination provisions of § 4112.02.

Accordingly, the Court rejects Overlook's request for summary judgment on the Spencers negligence claim.

Based upon the foregoing, the Court overrules Overlook's Motion for Summary Judgment (Doc. # 32).